FILED
U.S. DISTRICT COURT

2008 JUL -7  P 12: 34

DISTRICT OF UTAH

BY: _____

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ISLAND PEAK RANCH, L.L.C., a Limited Liability Company, TODD B. CROSLAND, DOUG K. ANDERSON, VAL GIBSON, Individuals, and BRENT DAVIES, TRUSTEE for CROSLAND DEVELOPMENT,<br><br>     Plaintiffs,<br><br>     v.<br><br>FIIK INVESTMENT AND HOLDINGS, INC., EDGAR M. BIAS, DENNIS COPE, WELLS FARGO BANK, KEVIN KAUFMAN, JOHN STERNS, R.J. RIEGER, CHARLES COVELL, PARTNER BANK, AD, JOHN HOGLE, COMISION CENTRAL de ENERGIA, GREEN GABLES MANAGEMENT, and JOHN DOES 1-10,<br><br>     Defendant. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br><br><br><br>Civil No.  2:02-CV-562<br><br><br>Judge Dee Benson |

        This matter came before the Court for a bench trial on May 5-6, 2008.  Plaintiffs Douglas

Anderson and Todd Crosland, individually and representing Island Peak Ranch, LLC, were

present at the trial and were represented by counsel, J. Mark Gibb, Matthew G. Grimmer, and Z.

Ryan Pahnke, of Durham, Jones & Pinegar, and Tom D. Branch, of Tom D. Branch, LLC.

Defendant Wells Fargo Bank ("Wells Fargo") was present at trial, through its representative, and

was represented by counsel, James S. Jardine and Liesel W. Stevens, of Ray Quinney &

Nebeker.  Having considered the parties' proposed findings of fact and conclusions of law, the

relevant law, and the evidence presented at trial, the Court issues the following findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

1.       The limited issue at trial was whether there is an agreement containing an arbitration provision encompassing Plaintiffs' claims against Wells Fargo in connection with Wells Fargo's motion to compel arbitration.

### Parties

2.       Plaintiffs Todd Crosland and Doug Anderson are residents of Utah.

3.       Plaintiff Island Peak Ranch, LLC ("Island Peak"), is a Utah limited liability company that was formed prior to the events of this case.  Trial Testimony of Todd Crosland, Transcript at 37 ("Crosland at ___".)[1]  Crosland and Anderson each own 50% of the interest in Island Peak and are co-managing members.  (*Id.* at 29.)

4.       Defendant FIIK Investment and Holdings, Inc. ("FIIK") was an entity used by defendant Bias and other individual defendants to promote an investment opportunity to Plaintiffs Crosland, Anderson and Island Peak in 2000.  FIIK's offices were located in Houston, Texas.  To date, FIIK has not been served in this case.

5.       Defendant Edgar Bias was a principal in and apparently the CEO of FIIK. (Crosland at 29.)

6.       Defendant Wells Fargo Bank, N.A. is a national banking organization with offices in Houston, Texas and Salt Lake City, Utah.

---

[1]  The trial testimony of all witnesses at trial will be designated herein as "Crosland at ___" or "Anderson at ___," etc.

**Initial Contacts Between FIIK and Plaintiffs**

7.     According to Plaintiffs' Amended Complaint, Crosland and Anderson were solicited to invest cash via a proposed investment contract with FIIK. FIIK sought investors to fund a $50 million pool of funds which FIIK would then use to engage in "treasury trades" involving discounted purchases of secure-government issued securities that would offer high investment yields to pool investors. (Amended Complaint, ¶ 49.)

8.     On May 25, 2000, Plaintiff Crosland invested an initial $300,000 with FIIK. (*Id.*; Crosland at 30.)

9.     On or around June 1, 2000, FIIK reported to Crosland that he had earned a 50% return on this investment, or an additional $150,000. (Amen. Complt. at ¶51; Crosland at 31-32.) FIIK then advised Crosland of an additional investment opportunity for a larger amount of $1,500,000 at an even higher return. (Amen. Complt. at ¶ 52; Crosland at 32-33, 36.)

10.     At some point after learning of the new investment opportunity, Crosland contacted Anderson to invite him to consider participating in the new investment with FIIK. (Crosland at 35, 37; Anderson at 141.)

11.     Over the next few weeks, Crosland and Anderson had communications with FIIK representatives about the investment opportunity. As part of these communications, Plaintiffs discussed with Bias and others the nature and circumstances of the FIIK checking account at a Wells Fargo branch in Houston, Texas, into which their funds would be placed and how that account was to operate. (Crosland at 33-34, 38, 40-41; Anderson at 144-45.) Specifically, FIIK proposed that Plaintiffs place their investment in a checking account in the name of FIIK on which Plaintiffs would be signers. In contrast, Plaintiff Anderson wanted an investment account

under their sole control.  (Anderson at 144-45.)  These discussions were only with

representatives of FIIK; Plaintiffs had no contact with Wells Fargo prior to June 21, 2000.

(Crosland at 34; DeBesse at 236.)

12.     On June 19, 2000, FIIK sent a letter to Crosland and Anderson promising a 100%

return on their proposed investment within 30 banking days.  (Trial Exhibit FF; Crosland at 39-

40, 43; Anderson at 143.)   Despite this remarkable proposed return, Plaintiffs believed that their

investment would not be at risk.  (Anderson at 143.)

13.     Bias invited Crosland and Anderson to Houston, Texas to meet FIIK's agents in

person and to participate in the establishment of a new bank account into which the Island Peak

investment would be wired and held.  (Amen. Complt. at ¶54; Trial Exhibit J.)

14.     Crosland and Anderson flew from Salt Lake City to Houston on June 20, 2000.

They met with Bias and other FIIK agents for dinner and discussed the terms of the proposed

investment.  (Crosland at 38, 41-42; Anderson at 148-49.)  They also discussed the establishment

of an account with Wells Fargo.  (Anderson at 148-49.)

15.     On June 20, 2000, Bias by himself opened a checking account, Account

XXXXXX213 (the "213 Account") in the name of FIIK at the Post Oak Branch.  (Trial Exhibit

D.)  In the block labeled, "Agreement: Authorized Signer", it provides that "I understand that,

under this program, at my request or the request of the Bank, disputes must be resolved by an

arbitration."  (*Id*.)  The 213 Account is governed by the terms and conditions set out in the Texas

Business Disclosure brochure.  (Trial Exhibit E.)  The Wells Fargo officer who opened the 213

Account was Stacy Massi.  (Trial Exhibit D; DeBesse at 240.)

4

**Plaintiffs' Visit to the Wells Fargo Post Oak Branch on June 21, 2000**

16.     On the morning of June 21, 2000, Crosland and Anderson went to the Post Oak Branch of Wells Fargo, in Houston, Texas.  There they met with Tom DeBesse, the Store Manager of the Post Oak Branch.  There is a conflict in the testimony as to what was said and what was done in this meeting.  For reasons set out below, it is not necessary for the Court to resolve that conflict in this trial.

17.     The allegations of the Amended Complaint (Trial Exhibit J) regarding the discussions and actions on the 213 Account have been placed in evidence by Defendant Wells Fargo as a judicial admission.  The following are specific allegations in the Amended Complaint on which Wells Fargo seeks judicial admission:

a.     Plaintiffs allege in their Amended Complaint that DeBesse provided them with an account opening agreement, which they then completed.  (*Id.* at ¶ 64.)  With the completion of the account opening agreement, the account was opened and assigned the 213 account number (the "213 Account").[2]  (*Id.* at ¶ 65.)]

b.     Plaintiffs' Amended Complaint alleges that Anderson and Crosland were "joint signers on the Island Peak/FIIK Account . . ." (Am. Complt., ¶ 168.)

c.     Plaintiffs' Amended Complaint alleges that "Crosland, Anderson and Island Peak have performed all conditions, covenants and obligations required by them in accordance with the terms and conditions of the deposit agreement with Wells Fargo Texas." (*Id.* at ¶ 169.)

---

[2] This allegation conflicts with the documentary evidence that the 213 Account was opened the prior day by Bias alone.  (Tr. Exhibit B.)

18.     At trial, Plaintiffs Crosland and Anderson testified that they discussed with DeBesse having a restricted checking account in the name of FIIK in which there would be a two signature requirement for any withdrawal of funds and that they were to be made authorized signers on that account. (Crosland at 41, 48, 104; Anderson at 231-32.) Both testified that DeBesse told them that such an arrangement was possible and that he would assist in the account. (Crosland at 48; Anderson at 151-52.) Plaintiffs did not see the 213 Account Application form or fill out any paperwork for the 213 Account at that time. (Crosland at 58-59; Anderson at 153, 227.) They were told they would be sent signature cards for that account via federal express. (Crosland at 50-51.) Crosland and Anderson testified that they did not ask for or take with them any documentation relating to the 213 Account. (Crosland at 50-53, 57; Anderson at 153-55, 178.)

19.     Anderson testified that they understood when they left Houston that they would be subject to the terms and conditions governing the 213 Account. (Anderson at 178.)

20.     DeBesse testified that the owner of a checking account, FIIK in the case of the 213 Account, could authorize additional signers on the account. (DeBesse at 250.) Plaintiffs understood that FIIK had to authorize the addition of their names as signers on the account. (Anderson at 227-28.) Multiple signatures could be added to a checking account, if authorized by the account owner. (DeBesse at 241-42, 250.)

21.     There is no record that FIIK ever provided written authorization to Wells Fargo to add Crosland and Anderson as authorized signers on the 213 Account.

6

22.     Crosland testified that Bias was present during their meeting with DeBesse. According to Crosland, Bias explained to DeBesse their proposal that the account be restricted by a dual-signature requirement and the Bank agreed.  (Crosland at 46, 48.)

23.     DeBesse testified that he recalled meeting Crosland and Anderson and discussing with them whether a two signature account could be opened and that he explained to them that such a requirement could not be enforced by the Bank.  (DeBesse at 239-40.)  DeBesse testified that his response was consistent with the Bank's policy, as described in the Texas Business Disclosure (Tr. Exhibit E) at page 9:

> The Bank's Liability To You . . .The Bank will have no responsibility for reviewing the number or combination of signatures on an Item drawn against your account.  This means that if you have indicated that more than one signature is required in connection with an Item drawn on your account, the Bank will have no liability to you if a transaction is conducted on or through your account contrary to the signature requirements you have specified, provided at least one of the required signatures appears on the Item.

(DeBesse at 241.)

24.     DeBesse testified that he had no recollection of Bias being part of the meeting or of adding Plaintiffs as signers to a FIIK account on that day.  (DeBesse at 237, 239-40, 243.)  He also did not recall arranging for any signature cards to be sent to Plaintiffs via federal express, nor did he see any need to do so since signature forms were available at the time in the Bank.  (DeBesse at 243-44.)

25.     The Texas Business Disclosure (the "Account Agreement") (Tr. Exhibit E), the account agreement referenced in the Account Application and applicable to the 213 Account, provides in two places for arbitration at the election of either party.  First, on page 8 in the "General" section, it states: "Under this program, at the request of you or the Bank, disputes

must be resolved by an arbitration proceeding before a neutral arbitrator.  If arbitration is

requested, you do not have the right to a jury or court trial to resolve the dispute." Second, on

pages 60-61, the Account Agreement repeats that "either of us may submit a dispute to binding

arbitration at any reasonable time notwithstanding that a lawsuit or other proceeding has been

commenced" and sets out in detail the terms regarding resolution of disputes by arbitration.

26.     The Account Agreement defines a "dispute" broadly as:

> any unresolved disagreement between you and the Bank that relates in any
> way to accounts or services described in this brochure, or to your use of any
> staffed banking location, Bank ATM, or any other method you may use to
> access the Bank.  It includes any claim that arises out of or is related to these
> accounts, services or related agreements.

Account Agreement at 60 (Tr. Exhibit E).

27.     By its terms, the Account Agreement applies to the "owner(s) and, where

applicable, each authorized signer of a business deposit account . . ." (*Id.* at 7.)

28.     The Account Agreement further provides that "[y]our use of your account or a

related service, including a balance inquiry or any other communication with the Bank about

your account, will show your consent to this Agreement." (*Id.* at 7.)

29.     Plaintiffs testified that they faxed a letter to DeBesse, Trial Exhibit 4, on June 22,

2000. (Crosland at 105-06; Anderson at 210.)  However, Plaintiffs did not produce a copy of

that letter with a fax legend showing that it had been faxed. (Crosland at 107-08; Anderson at

225.)  DeBesse testified that he has no recollection of receiving the letter. (DeBesse at 248.)

He also testified that if he had received such a letter, he would have responded because it

contained incorrect information. (DeBesse at 248-50.)  Plaintiffs did not seek or receive any

written response from Wells Fargo to their letter. (Anderson at 226.)

8

30.     One or more days after visiting Houston, Anderson and Crosland received signature cards for what they recall was the 213 Account, then signed and sent them via federal express to the Wells Fargo Post Oak Branch in Houston.  (Crosland at 92-93; Anderson at 176-77.)  Crosland and Anderson sent the signature cards back in their capacities as co-managers of Island Peak Ranch, LLC.  (Crosland at 93; Anderson at 155-56.)  Plaintiffs did not keep a copy of the signature cards they testified they signed and sent back to the Post Oak Branch. (Anderson at 177, 226.)

31.     A federal express package from Anderson and Crosland was received in the Houston Post Oak branch by a bank officer, Stacy Massi.  Ms. Massi testified that upon receiving some signer cards for a FIIK account from Anderson and Crosland via Federal Express, she brought the signature cards to the attention of Edgar Bias of FIIK Investment and Holdings, Inc., who told her that he would not authorize having Crosland and Anderson added as authorized signers but would take care of the issue himself.  She does not recall which account the proposed signature cards related to.  At that point Ms. Massi took no further action.  (Massi at 299.)

32.     Crosland and Anderson did not request or obtain written confirmation from Wells Fargo that they had been added as authorized signers to the 213 Account.  (Crosland at 94, 100.) There was no evidence at trial that Crosland and Anderson were added as authorized signers on the 213 Account prior to the time the monies were transferred out of the 213 Account on July 6, 2000.

## Opening of the 236 Account

33.     On June 21, 2000, while they were in the Post Oak Branch, Crosland and Anderson opened a savings account at the Post Oak Branch, which was assigned account number XXXXXXX236 (the "236 Account"). (Crosland at 55, 58-59; Anderson at 158.) Anderson testified that DeBesse asked him and Crosland to open a savings account "to establish a relationship" with the bank via this account. (Anderson at 156.) Plaintiffs testified that they planned to transfer their profit from the FIIK investment into the savings account from the 213 Account. (Crosland at 55; Anderson at 157.) DeBesse testified that they may have opened the 236 Account as a result of his suggestion that because the Bank couldn't enforce a two signature requirement on the 213 Account, this was an alternative method for handling the issue. (DeBesse at 242-43.)

34.     Plaintiffs testified that they had not planned to open a savings account when they went to Houston and that it was opened at the Bank's suggestion. (Crosland at 56-57; Anderson at 156.) However, it seems clear that Plaintiffs would not have opened the 236 Account in Houston, Texas but for their interest in the potential FIIK investment. (Anderson at 157.)

35.     The application for the 236 Account (Tr. Exhibit L), which was signed by Crosland and Anderson as joint owners, states: "I have received a copy of your applicable account agreement and Use of Information brochure and I agree to be bound by them."

36.     The "applicable account agreement" referenced in the 236 Account application is the Wells Fargo Consumer Account Agreement (Trial Exhibit Z). On page 4, that agreement states:

> Please note: This Agreement contains the terms of the dispute resolution program to be followed in the event of a dispute between you and the Bank. These terms are set forth in the Consumer Account Fee and Information Schedule in the section entitled "Resolving Disputes: Arbitration Agreement." Please read them carefully. Under this program, at the request of you or the Bank, disputes must be resolved by an arbitration proceeding before a neutral arbitrator. If arbitration is requested, you do not have the right to a jury or court trial to resolve the dispute.

(*Id.*) The Wells Fargo Texas Consumer Account Fee and Information Schedule is Trial Exhibit Y.

37.    On page 35, the Consumer Account Fee and Information Schedule provides, in part, as follows:

> Additional Terms Applicable to Texas Accounts
>
> Resolving Disputes: Arbitration Agreement
>
> . . . you agree that by opening or maintaining a deposit account with the Bank or by accepting a service from the Bank described in this brochure . . . that any dispute between us, regardless of when it arose, will be settled using the following procedures. . .
> A dispute is any unresolved disagreement between you and the Bank that relates in any way to accounts or services described in this brochure, or to your use of any staffed banking location, Bank ATM, or any other method you may use to access the Bank. It includes any claim that arises out of or is related to these accounts, services or related agreements.

(*Id.*)

38.    Plaintiffs received a copy of Exhibits Y and Z. (Crosland at 59-60; Anderson at 159.) Plaintiffs understood they had agreed to be bound by these account terms. (Crosland at 59-60; Anderson at 160.)

## **Opening of the 202 Account**

39.    On June 21, 2000, Crosland and Anderson flew back to Salt Lake City, Utah.

That afternoon they went to the Main Street Branch of Wells Fargo where they met with Michael Brussock, a private banker, and opened a Wells Platinum checking account at Wells Fargo in the name of Island Peak Ranch, LLC. (Crosland at 63-64, 66; Anderson at 160-62.) That account was assigned the account number XX-XXXXX202 (the "202 Account").

40.     As of this point in time on June 21, 2000, Plaintiffs had not decided whether to use Island Peak Ranch, LLC as the entity to make their investment with FIIK. (Crosland at 44, 57.) In addition, Anderson wanted to make one last ditch effort to persuade Bias to allow them to place their investment in the 202 Account instead of the 213 Account. (Anderson at 147, 165.) That effort was unsuccessful. This fact is important because it suggests that when they were in Houston meeting with DeBesse, Plaintiffs had not finally committed to place their funds in the 213 Account.

41.     Plaintiffs ultimately used the 202 Account to collect their $1.2 million and transfer it into the 213 Account as part of having the investment made by Island Peak Ranch, LLC. (Crosland at 118; Anderson at 179-80.)

42.     Island Peak had other existing accounts from which it could have transferred the funds to the 213 Account. (Anderson at 160-61.) Therefore, it appears that the only reason for Island Peak opening the 202 Account was either to try to persuade FIIK to use that account instead of the 213 Account for the investment or else to otherwise facilitate the FIIK investment.

43.     Crosland and Anderson testified that while they were in Houston, DeBesse had given them the name of Michael Brussock to see in Salt Lake City to set up the 202 Account. (Crosland at 50-51, 63; Anderson at 160, 222.)

44.     Crosland and Anderson recall signing an application form to open the 202

Account.  (Crosland at 67, 70; Anderson at 163.)  However, no copy of that original application exists.

45.     A copy of the Wells Platinum Account application for the 202 Account in the name of Island Peak Ranch, LLC, signed by Crosland and Anderson and dated in October 2000, was admitted as Trial Exhibit CC.  Crosland and Anderson testified that they signed that application.  (Crosland at 65, 68; Anderson at 162.)  Anderson believed that application was signed in connection with adding Elene Kontgis as a signer on that account.  (Anderson at 162.)

46.     Michael Brussock testified that the application form signed by Crosland and Anderson in October 2000 (Tr. Exhibit CC) is the same form he would have used to open the 202 Account in June 2000.  (Brussock at 289.)  A clean copy of that form was admitted as Trial Exhibit BB.  Crosland and Anderson testified that they have no basis to think that the application form they signed in June 2000 to open the 202 Account was not in the form of Trial Exhibit BB.  (Crosland at 70; Anderson at 163.)

47.     The application form for the 202 Account (Tr. Exhibit BB) contains an Acknowledgement of a stipulation to the Comprehensive Dispute Resolution Program, as described in the Wells Platinum Account Disclosure Statement and the Credit Card Disclosure Statement.  In addition, the form signed by Crosland and Anderson dated October 2000, Trial Exhibit CC, contains the same Acknowledgement.

48.     Michael Brussock testified that the Wells Platinum Account Disclosure Statement, Trial Exhibit EE, was the form in use in 2000 and applicable to the 202 Account.  (Brussock at 290-91.)  Brussock testified that either he or his assistant always provided the Disclosure Statement to customers when opening a new account.  (Brussock at 291.)  The bank

13

was required by federal law to provide account disclosures and terms to the account owner

whenever a new account was opened.   (DeBesse at 247.)

49.     The Wells Platinum Account Disclosure Statement provides as follows:

> [Y]ou agree that by opening or maintaining a Wells Platinum Account
> with us or by accepting a service from us described in this brochure . . .
> that any dispute between you and us, regardless of when it arose, will be
> settled, at the option of you or us, using the following [arbitration]
> procedures. . . A "dispute" is any unresolved disagreement between you
> and us that relates in any way to accounts or services described in this
> brochure, or to your use of any of our staffed banking locations, our
> ATMs, or any other method you may use to access us.

(Tr. Exhibit EE at 4.)

50.     Plaintiffs testified that in their meeting with Brussock they asked about the status

of the 213 Account and that he pulled up a computer screen that showed a two signature

restriction on the 213 Account.  (Crosland at 78-79, 118-19; Anderson at 223.)  Brussock has no

recollection of that transpiring.  (Brussock at 291.)   At this time, Plaintiffs would not have

received let alone signed and sent back the signature cards relating to the 213 Account.

51.     As suggested evidence of their alleged oral agreement with the Bank, Plaintiffs

introduced Trial Exhibit 14 which is an electronic record of Wells Fargo showing that a two

signature restraint was placed on the 213 Account late on the afternoon of June 21, 2000,

apparently by a Wells Fargo employee by the name of Corwin Higley, located in Salt Lake City.

The electronic record does not show any authorized signer other than the account owner, FIIK

through Edgar Bias.  (Higley at 136-37.)  Anderson has no recollection of ever meeting Higley.

(Anderson at 230.)  Higley has no recollection, understanding or explanation as to how that

restraint might have been added.  (Higley at 137-39.)

52.     As evidenced by the account applications for the 202 and 236 accounts and

accompanying account agreements signed by Plaintiffs on June 21, 2000, and by the testimony of Mr. DeBesse, Wells Fargo includes arbitration provisions in all its account agreements. (DeBesse at 250.)

### Plaintiffs' Decision To Make The Investment and Written Investment Agreement

53.     On June 22, 2000, Plaintiffs received a letter addressed to Island Peak Ranch, LLC confirming the terms of the proposed agreement.  (Tr. Exhibit H.)  The letter was a factor in the Plaintiffs' decision to proceed with the investment.   (Crosland at 82.)  By this date, Plaintiffs had decided to make their investment in the name of Island Peak Ranch, LLC. (Crosland at 83; Anderson at 167.)

54.     On June 22, 2000, on behalf of Island Peak Ranch, LLC, Crosland and Anderson signed the Private Placement Memorandum and Confidentiality Agreement, and attached Escrow Agreement, reflecting the terms of their investment agreement with FIIK.  (Tr. Exhibit B; Crosland at 83; Anderson at 167.)  In the Escrow Agreement, where the 213 Account is identified as the account into which Island Peak is to transfer the investment funds, Anderson wrote in by hand "Joint Signature" and listed the names of Bias, Crosland and Anderson. (Anderson at 175.)  This appears to be the only written indication of an agreement for the 213 Account, and it purports to be between FIIK and Island Peak.  However, there is no copy of the Escrow Agreement with Bias's signature on behalf of FIIK.  (Crosland at 91; Anderson at 175.)

55.     The Escrow Agreement which is part of Trial Exhibit B contradicts Plaintiffs' allegations of an oral agreement since Plaintiffs also contend that it was pursuant to that written Escrow Agreement that they were to be made authorized signers by FIIK and to have a two signature requirement placed on the 213 Account.

56.    Island Peak transferred the $1.2 million from the 202 Account to the 213 Account on June 23, 2000.  (Crosland at 99.)

57.    FIIK withdrew the $1.2 million from the 213 Account on July 6, 2000.

### Online Access to the 213 Account

58.    Wells Fargo presented the following evidence relating to Crosland's electronic application for online access to the 213 Account:

59.    Trial Exhibit W reflects a copy of screen shot of a computer screen of data from a Wells Fargo electronic database showing the following: (1) that plaintiff Todd Crosland made an electronic application on June 23, 2000 for online access to the 213 Account; and (2) that Mr. Crosland's application was processed and approved on July 14, 2000, which included his being made an authorized signer on the 213 Account and being given online access to that account. (Dep. of Rhonda Sharp at p. 73:19 – 76:15.)  The application contains Crosland's phone numbers and email address but the address and EIN number belong to FIIK.  (Crosland at 97.)

60.    Crosland recalls having initiated the electronic application for on-line access to the 213 Account.  (Crosland at 95.)  While his testimony is vague on the point, Crosland testified that on June 23, 2000, as a result of discussions with Anderson on the need to monitor the 213 account, he believes that "he made an application electronically to have online access to the 213 account." (Crosland at 96-97; Anderson at 179.)

61.    Plaintiffs suggested at trial that someone else, such as FIIK, made the electronic

application reflected in Trial Exhibit W.   However, since FIIK already had access to the 213

Account, that suggestion lacks plausibility and Plaintiffs suggested no other plausible

explanation for someone other than Crosland making the application.

      62.    At the time he made the electronic application for online access, Crosland thought

he was an authorized signer on the 213 Account.  (Crosland at 98-99.)

      63.    On July 14, 2000, pursuant to the electronic application, Wells Fargo made

Crosland an authorized signer on the 213 Account and gave him online access to that account.

(Tr. Exhibit W; Graham at 302.)

      64.    On or after July 14, 2000, pursuant to his June 23, 2000 application for on-line

access to the 213 Account, Crosland was given access to the 213 Account.  (Crosland at 124;

Anderson at 179.)

      65.    As set forth in the Amended Complaint, Plaintiffs allege the following causes of

action against Wells Fargo: fraud; negligent misrepresentation; breach of contract – account

agreement; and negligence.

## CONCLUSIONS OF LAW

### Burden of Proof

1.      The party seeking to compel arbitration, in this case Wells Fargo, has the burden of demonstrating the existence of an enforceable agreement to arbitrate. 4 Am. Jur. 2d Alternative Dispute Resolution § 98; *ASW Allstate Painting & Construction Co., Inc. v. Lexington Ins. Co.*, 188 F.3d 307 (5th Cir. 1999); *McCoy v. Blue Cross and Blue Shield of Utah*, 20 P.3d 901 (Utah 2001). This determination is a matter of state contract law and the burden is a preponderance of the evidence. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Nuhn v. Broadbent*, 507 P.2d 371, 372 (Utah 1973).

2.      Where Wells Fargo has established the existence of agreements containing arbitration provisions, the burden is on Plaintiffs to establish that the dispute falls outside the scope of the arbitration provision. Martin Domke on Commercial Arbitration, §15:5 (3d ed. 2007). In light of the strong federal policy favoring arbitration, there is a presumption in favor of disputes coming within the scope of the particular arbitration provision. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *Armijo v. Prudential Insurance Co. of America*, 72 F.3d 793, 797 (10th Cir. 1995). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Armijo*, 72 F.3d at 798 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 474 U.S. 614, 626 (1985)).

3.      The party opposing arbitration has the burden of showing "compelling proof" that the arbitration clause at issue was not intended to cover the parties' dispute. *Bernstein v. Shearson/American Exp. Inc.*, 1987 WL 16964 (S.D.N.Y. 1987) (plaintiff failed to meet burden of showing "compelling proof" that the arbitration clause contained in a transaction account's

1

customer agreement was not intended to cover disputes arising out of a separate deposit account); *see also Ketchum v. Almahurst Bloodstock IV*, 685 F.Supp. 786 (D.Kan. 1988) ("When an arbitration clause is broad, 'any claim that falls within its scope will be considered arbitrable absent compelling proof to the contrary . . Proof to the contrary requires language that is clear and unambiguous.'"); *Strauss, Inc. v. United Food and Commercial Workers Union*, 503 F.Supp.2d 567 (E.D.N.Y. 2007) (same); and *International Union of Elevator Constructors v. Nat'l Elevator Industry, Inc.*, 772 F.2d 10 (2d Cir. 1985) (same).

4.      Thus, Plaintiffs had the burden at trial of producing "compelling proof" that the arbitration provisions for the 236 and 202 Accounts, as well as for the 213 Account, do not encompass the parties' dispute in this matter.   As set forth below, Plaintiffs did not meet their burden.

### The Arbitration Provision in the 236 Account Agreement Encompasses the Parties' Dispute.

5.      On June 21, 2000, as part of their plan to invest with FIIK, Plaintiffs Crosland and Anderson opened the 236 Savings Account, the applicable account agreement which includes a broad arbitration provision "applicable to Texas accounts."

6.      It is undisputed that the 236 Account is governed by a binding arbitration provision.  The language of that arbitration clause is broad.  It defines "dispute" as any disagreement between the customer and the Bank that "relates in any way to accounts or services . . . or to [the] use of any staffed banking location, Bank ATM or any other method" of accessing the bank.  "Dispute" further includes "any claim that rises out of or is related to these accounts, services or related agreements."  (Tr. Exhibit Y at p. 35.)

7.      The disputes in this case, including Plaintiffs' claim that Wells Fargo breached an

2

agreement to impose a two signature requirement on the 213 Account, relate to accounts or

services provided by Wells Fargo and the use of a staffed banking location, i.e., the Houston Post

Oak Branch.  In addition, in light of the opening of the 236 Account in connection with

Plaintiffs' consideration of the FIIK investment, the 236 Account is related to the Plaintiffs'

claims about the 213 Account

      8.      One factor in considering whether two accounts are related is whether the

agreements are executed closely in time and by the same parties.  *Consolidated Brokers Ins.*

*Services, Inc. v. Pan-American Assurance Co.*, 427 F.Supp.2d 1074, 1082 (D.Kan. 2006).

Crosland and Anderson completed the application for the 236 Account on the same day they also

claim they became signers and obtained a restraint agreement on the 213 Account.  Plaintiffs

testified that they opened the 236 Account to establish a relationship with the bank and to

eventually transfer the profit from the 213 Account into the 236 Account.

      9.      As a result, and under the guiding federal law, Plaintiffs cannot show that the 236

and 213 Accounts are not related.  Accordingly, the 236 Account arbitration provision governs

the parties' dispute over the 213 Account.  *See also  Safer v. Nelson Financial Group, Inc.*, 422

F.3d 289, 296 (5th Cir. 2005) ("In determining whether two agreements are related, 'it is well-

settled that several writings executed by the same parties substantially at the same time and

relating to the same subject-matter may be read together as forming the parts of one

transaction.'" (citing *Bailey v. Hannibal & St. J. R.R. Co.*, 84 U.S. 96 (1872)); and *ARW*

*Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) (holding that a dispute arising

out of an agreement that lacked an arbitration clause was still subject to arbitration based on the

broad arbitration provision contained in other agreements relating to the same joint venture).

3

10.     Accordingly, the broad arbitration provision in the 236 Account agreement governs the parties' dispute in this matter. *Consolidated Brokers Ins. Services, Inc. v. Pan-American Assurance Co.*, 427 F.Supp.2d at 1082; *ARW Exploration Corp. v. Aguirre*, 45 F.3d at 1462.

11.     Plaintiffs contend that because they opened the 236 Account in their own personal names, Island Peak is not bound by the 236 Account Agreement. However, Plaintiffs testified that on June 21, 2000, they had not decided in which name to make the investment and that they planned to transfer the profits from the investment into the 236 Account. In addition, "[i]t is well established in the law that a principal is liable for the acts of [its] agent within the scope of the agent's authority, irrespective of whether the principal is disclosed or undisclosed." *Wasatch Oil & Gas, L.L.C. v. Reott*, 163 P.3d 713, 729 (Utah App. 2007); *Thomson CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ("A nonsignatory party may be bound to an arbitration agreement is so dictated by the 'ordinary principles of contract and agency.'"). Thus, Island Peak is bound by the actions of Crosland and Anderson, including their agreement to arbitrate in the 236 Account.

### The Arbitration Provision in the 202 Account Agreement Also Encompasses the Parties' Dispute.

12.     The arbitration provision in the 202 Account agreement, which contains the same definition of "dispute" as the 236 Account agreement, governs the parties' dispute for the same reasons set forth above. Crosland and Anderson opened the 202 Account in the name of Island Peak first to try to persuade FIIK to use that account for the investment and, when that failed, to facilitate the FIIK investment by collecting the funds in that account before transferring them to the 213 Account.

4

13.     Plaintiffs' claims in this case thus come within the arbitration provision for the

202 Account (Tr. Exhibit EE at 4) because Plaintiffs allege they were using other services or

accounts of Wells Fargo, they were using the staffed banking facility at the Post Oak Branch,

and because the 202 Account agreement was closely related to the parties' agreement regarding

the 213 Account.

14.     Accordingly, the broad arbitration provision in the 202 Account agreement

governs the parties' dispute in this matter. *Consolidated Brokers Ins. Services, Inc. v. Pan-*

*American Assurance Co.*, 427 F.Supp.2d at 1082; *ARW Exploration Corp. v. Aguirre*, 45 F.3d at

1462.

### Plaintiffs Are Bound By the Terms and Conditions of the 213 Account.

15.     Even though the arbitration provisions of the 202 and 236 Accounts encompass

this dispute which resolves the question of arbitration in this case, the Court also considers Wells

Fargo's arguments that the arbitration provision of the 213 Account applies.   Wells Fargo

contends that the account agreement of the 213 Account applies in this case on three theories:

(1) that Plaintiffs have conceded the point as a matter of judicial estoppel; (2) that Plaintiffs'

claims depend on the existence of an agreement relating to the 213 Account which as a matter of

logical necessity comes within the account's terms and conditions including the arbitration

provision; and, (3) Plaintiff Crosland's electronic application for online access to the 213

Account, which Wells Fargo granted, and Crosland's subsequent access to that account.

### Judicial Estoppel

16.     As set forth above, Plaintiffs allege in their Amended Complaint that they "have

5

performed all conditions, covenants and obligations required by them in accordance with the terms and conditions of the deposit agreement with Wells Fargo Texas." (Amen. Complt, ¶ 169.)

17.     Plaintiffs are bound by the allegations of their Amended Complaint and cannot take a contrary position at trial. *See Upstate Shredding, LLC. v. Carloss Well Supply Co.*, 84 F.Supp.2d 357 (N.D.N.Y. 2000) (plaintiffs, whose complaint alleged a breach of the terms and conditions of an express warranty, could not oppose defendant's motion to compel arbitration based on an arbitration provision in the warranty contract: "In short, the plaintiffs cannot have it both ways. They cannot rely on the contract, when it works to their advantage, and repudiate it when it works to their disadvantage."); and *Bellefonte Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 616, m. 10 (2d Cir. 1985) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound through the course of the proceeding."). As a result of their judicial admission, Plaintiffs cannot now avoid the "conditions, covenants and obligations" of the Texas Business Disclosure including its arbitration provision.

18.     Thus, Plaintiffs are bound by their allegation that they complied with the account agreement for the 213 Account, the Texas Business Disclosure and its terms, and therefore have agreed to the arbitration provision of that Disclosure as a matter of law.

<u>Arbitration as a Matter of Logical Necessity</u>

19.     Plaintiffs' claims are premised on the existence of an agreement with Wells Fargo to allow them to become authorized signers on the 213 Account and to impose a two signature requirement on that account. As discussed above, this claim arises from the written agreement between FIIK and Island Peak in the Escrow Agreement of Exhibit B on how they proposed to

6

establish the 213 Account and the required written authorization by the account owner, FIIK, of Plaintiffs as authorized signers and for a two signature restraint to be placed on the account.

20.     Plaintiffs cannot succeed on their claims in this case without establishing the alleged agreement on how the 213 Account was to be operated, which necessarily triggers the associated account agreement and its arbitration provision.

21.     Thus, as a logical necessity, Plaintiffs' claims cannot succeed without coming within the arbitration provision.  On the basis of that circumstance, the Court finds that the only way Plaintiffs' claims can proceed to full and complete adjudication is in arbitration.

Crosland's Application for Online Access for the 213 Account<br>and his Access to the Account.

22.     Separate from the issue of whether there was an agreement by Plaintiffs on June 21, 2000, the evidence establishes that Plaintiff Crosland's online application for access to the 213 Account and his subsequent access to the account constituted an acceptance of the account terms and conditions.   Crosland testified that at the time he made the electronic application, he thought he was an authorized signer on the 213 Account, and thus presumably assumed he would subject to the terms and conditions of the agreement.  (Crosland at 98-99.)

23.     Under the terms of the Texas Business Disclosure agreement governing the 213 Account, Crosland's "use of [the] account or a related service, including a balance inquiry or any other communication with the Bank about your account, will show your consent to this Agreement."  (Trial Exhibit E at 7.)

24.     Crosland's application for online access to the 213 Account and his subsequent access to that account clearly constitute "use of [the] account" and "communication with the Bank about [the] account."  *See Fahey v. U.S. Bank Nat. Ass'n*, No. 4:05CV01453 FRB, 2006

7

WL 2850529 (E.D. Mo. Sept. 29, 2006), in which the plaintiff filed suit against defendant

alleging negligence and violations of the Fair Credit Reporting Act.  Plaintiff opposed the bank's

motion to compel arbitration on the grounds that there was no proof he was actually an account

holder with U.S. Bank and no copy of an application or other document bearing his signature.

The court compelled arbitration, stating:

> Plaintiff's argument that U.S. Bank must submit an application or other
> document bearing his signature in order to prove the existence of an
> agreement is not compelling.  The evidence submitted by U.S. Bank
> shows that the two credit card accounts in question were issued to both
> plaintiff and his former wife as co-obligors, that the terms, including the
> arbitration clause, were provided to plaintiff and his former wife.  It is
> further clear that both of the cards were used.  *The use of the cards
> amounts to acceptance of the terms of the cardholder agreements.*

*Id.* at *2 (emphasis added); *see also Grasso v. First USA Bank*, 713 A.2d 304, 308-09 (Del.

Super. 1998) (credit card holder accepted cardholder agreement's terms and conditions by using

the credit card).

26. 25.    Plaintiffs' use of the 213 Account by accessing it amounts to acceptance of the

account's terms and conditions.  For this reason, Plaintiffs are bound by the Texas Business

Disclosure agreement's arbitration provision.

### It is Not Necessary for the Court to Rule On the Existence of an Alleged Oral Agreement for a Two-Signature Restraint on the 213 Account During Phase I of Trial.

26.    Plaintiffs spent a considerable amount of time during trial testifying and

presenting argument about the existence of an oral agreement for a two-signature restraint on the

213 Account.  Such testimony and argument are irrelevant to the purpose of Phase I, which was

limited to determining whether the parties agreed to arbitrate their dispute.  Plaintiffs cannot

prevail in Phase I by proving the existence of a contract that did *not* include an agreement to

arbitrate. Rather, Wells Fargo prevails if it establishes the existence of an agreement to arbitrate. *See* ¶¶ 1-3 above.

27.     Thus, whether or not Wells Fargo and Plaintiffs agreed to place a two-signature restraint on the 213 Account has no bearing on whether they agreed to arbitrate. *See Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc.*, 486 F.3d 989 (7th Cir. 2007) (on Nissan's motion to compel arbitration, issue was whether parties agreed to arbitrate, not whether M'Lady could prove the terms of an oral agreement that did not include an agreement to arbitrate). Accordingly, this Court does not find it necessary to rule on the existence of Plaintiffs' alleged oral agreement.

28.     Even if Plaintiffs' oral agreement theory is considered on the merits, however, it fails because the foundation of Plaintiffs' claim is their written Escrow Agreement with FIIK (Tr. Exhibit B) in which they wrote "Joint Signature" next to the 213 Account designation as the account into which they would transfer the investment funds.   The proposed authorization of them as signers and their desire to have a two signature restraint on the account both required written documentation.   Thus, any agreement between Plaintiffs and Wells Fargo would have to have been in writing.

### Plaintiffs' Motion to Reconsider Part of Order Denying Wells Fargo's Motion to Dismiss or Stay and to Compel Arbitration

29.     On May 1, 2008, Plaintiffs filed a Motion for Reconsideration of Part of this Court's Order Denying Wells Fargo's Motion to Dismiss or Stay and to Compel Arbitration dated October 25, 2005.  That motion seeks reconsideration of the part of the October 25, 2000 Order ("Order") that stated:

> The Court further find that if a contract exists, the arbitration provision contained in Wells Fargo's consumer account/deposit agreement applies to all of the claims raise by the Plaintiffs in this lawsuit, although this finding is without prejudice to Plaintiffs to move for reconsideration in the future.

30.     The Amended Complaint contains four causes of action – fraud, negligent misrepresentation, breach of contract, and negligence.    All three arbitration provisions – for the 202, 213 and 236 Accounts – contain broad language that would encompass "tort" claims as well as contract claims.  Moreover, all four claims focus on the alleged agreement relating to the 213 Account.

31.     The federal policy favoring arbitration counsels that the arbitration provisions should be construed broadly, and when done so in this case encompass all of the claims against Wells Fargo in the Amended Complaint.

32.     Plaintiffs have the burden of establishing by compelling proof the inapplicability of the arbitration provisions in question to Plaintiffs' claims.  *Ketchum v. Almahurst Bloodstock IV*, 685 F.Supp. 786 (D.Kan. 1988); *Telectronics Pacing Systems, Inc. v. Guidant Corp.*, 143 F.3d 428 (8th Cir. 1998).

33.     The two cases relied upon by Plaintiffs in their motion are: *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995) and *Altresco Philippines, Inc. v. CMS Generation Co.*, 111 F.3d 140, 1997 WL 186257 (10th Cir. 1997).  Both cases are inapposite. First, at issue in *Coors Brewing* was whether certain antitrust claims were governed by an arbitration clause covering "any dispute" arising from the "implementation, interpretation, and enforcement" of a licensing agreement.   The court held that the arbitration provision covered only those antitrust disputes that were related to the agreement.  Likewise, the court in *Altresco*

stated that "arbitration should be compelled 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Altresco*, 111 F.3d at *3, quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). The *Altresco* court held that the arbitration provisions at issue covered plaintiffs' claims arising from related contracts, but not plaintiffs' claim for intentional interference of an unrelated contract.

34.     The evidence presented at trial establishes that the three accounts in question were opened by Plaintiffs with Wells Fargo at approximately the same time to facilitate their FIIK investment.     Thus, the three account agreements are related to Plaintiffs' claims in this case.

35.     The arbitration provisions in the 236 and 202 Account Agreements are very broad. (*See* Findings of Fact, ¶¶ 36 and 48.) Since Plaintiffs have not offered "compelling proof" that the parties did not intend these provisions to apply to their dispute, arbitration must be compelled.

36.     Even if the burden rested on Wells Fargo to establish "compelling proof" that the applicable arbitration clauses pertaining to the 236, 202, and 213 Accounts were not intended to cover the parties' dispute, the evidence is sufficient for the Court to find that "compelling proof" has not been offered to show that the arbitration provisions do not encompass the parties' dispute in this matter. Accordingly, the parties' dispute is subject to arbitration.

## CONCLUSION

Based on all of the foregoing, the Court hereby ORDERS as follows:

11

1.    Defendant Wells Fargo's Motion to Compel Arbitration is granted.

2.    This matter is stayed pending completion of the arbitration.

Dated this _7th_ day of _July_, 2008.

                                    _____
                                    Hon. Dee Benson
                                    United States District Judge